

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| | ) | |
| Respondent, | ) | WD81263 |
| | ) | |
| v. | ) | OPINION FILED: June 18, 2019 |
| | ) | |
| EMILY USNICK, | ) | |
| | ) | |
| Appellant. | ) | |

**Appeal from the Circuit Court of Johnson County, Missouri**
The Honorable John R. O'Malley, Judge

Before Division Two: Cynthia L. Martin, Presiding Judge, Alok Ahuja, Judge and
Gary D. Witt, Judge

Emily Usnick ("Usnick") was convicted of first degree involuntary manslaughter following a jury trial in the Circuit Court of Johnson County. The jury found that Usnick was responsible for the death of her newborn daughter ("Baby Usnick") during an at-home, medically unattended birth. As charged, the State contended that Usnick recklessly caused the death of Baby Usnick "by giving birth to said child unattended and failing to secure assistance and medical attention for said child following birth and by enclosing said child in a plastic bag and container." The court sentenced Usnick to five years in the Department of Corrections. Usnick brings seven allegations of error on appeal. Because the State's

evidence did not establish a *corpus delicti* as to any of the bases on which Usnick was charged, we are required to reverse her conviction of first degree involuntary manslaughter as a matter of law.

## Factual Background

Usnick was an unmarried mother of three when she became pregnant in 2008. Two months before Baby Usnick was born, Usnick and her son moved into her uncle's home in the city of St. Elizabeth in Miller County. Usnick's uncle shared the home with five other people as well as others who stayed temporarily. Usnick had little interaction with the other occupants of the house; none knew that she was pregnant. Usnick did not have a working car or a job.

Usnick testified that she planned to give birth in a hospital and put the baby up for adoption through the hospital because she knew she could not care for another child. On January 15, 2009, Usnick went into labor while home alone. In a July 6, 2009 written statement to detectives ("Statement"), Usnick admitted smoking methamphetamine and marijuana the night before the birth. In her Statement she described Baby Usnick's birth as follows:

> On the night of January 15, 2009, I gave birth to Hannah Eden Usnick. The night prior to, I smoked meth and marijuana. That evening, I wasn't feeling well. My stomach was cramping really bad. I had started a load of laundry and when I came out of the laundry room into the hallway, my water broke. The house was back [sic] – the house was dark and silent. I went a few steps into the bathroom and pulled off my pants and underwear. I sat on the stool with one hand – right hand in parenthesis – on the countertop and my left hand on the edge of the bathtub.
>
> My pain was getting greater and the contractions were coming one right after another. I had an overwhelming urge to push, so I did, hard. I felt the head

2

start coming, so I pushed again. The head was out. I continued pushing with the pains. Her body came out and landed in the toilet. When I started to turn and look at the baby, she was laying on her right side. Her head was toward the back of the toilet and her feet were at the front. I started feeling sick, my stomach was tightening. I knew from prior births that the placenta was going to be coming. I continued to straddle the toilet, right hand on the counter and left hand on the side of the bathtub. It was about three minutes maybe from the time Hannah came out and the placenta was delivered.

After the placenta and everything else came out, my body was in shock, I was tired and hurting. It must have been four or five minutes before I brought myself to pull off of the stool. By then, everything and Hannah in such a small area, the liquid had – the liquid had rose in level. That is when I pulled her out of the toilet. I held her to my chest only for a minute. She wasn't moving, wasn't breathing. I was so scared. I pulled the waste paper basket closer to me and laid her in the top of it. She was – she was closer to me then rather than on the floor.

I sat on the stool and just looked at her. She was so beautiful. I really hate that things turned out this way. I wanted her to have a life, a good life and that is why I had the intention of putting her up for adoption. I will forever regret the poor decisions I've made not only leading up to that night, but especially that night. I have come to believe that it is possible with the time frame that Hannah may have drowned or suffocated while she was submerged in the water.[1]

This Statement was consistent with Usnick's trial testimony except that at trial she testified that she removed the baby from the toilet before she passed her placenta. At trial, Usnick testified that, immediately following the delivery, the baby was not moving, breathing, or crying, and she did not feel or see any signs of life. Usnick described the baby as "pink and a little blue . . . just silent and still." She believed Baby Usnick was "gone." Usnick placed the baby on a waste basket next to the toilet. After delivering the placenta, Usnick

---

[1] The Statement is quoted from the trial transcript as the Statement was read into the record. The written Statement was also introduced into evidence as Exhibit 29. The Statement as read at trial differs slightly from the actual language of Exhibit 29. The differences are largely grammatical and are not relevant to the issues presented in this appeal.

testified that she was unable to stand for several minutes. When she was able to move, Usnick placed the placenta in the waste basket with Baby Usnick and went to her room to get dressed. She then returned to the bathroom and placed the body in a plastic bag and placed the bag inside a tote and placed the tote in the trunk of her inoperable car. At that time she did not tell anyone that she had given birth or that the baby was dead. At the beginning of February, a former boyfriend, whom she had previously told that she was pregnant and he was the father, asked about the baby. She told him that she had given the baby to a cousin in Mexico, Missouri to adopt. He pointed out that he had not signed away his parental rights and wanted to see his child.

On February 3, 2009, while serving a search warrant in an unrelated methamphetamine investigation, police discovered the body of Baby Usnick in the trunk of the car. Usnick initially denied having been pregnant or giving birth.

In explaining why she did not seek medical attention, Usnick testified that her car was broken down, that she did not have minutes on her cell phone to call for help and, even if her cell phone had been available, there was inconsistent cell service at that house. She also testified that she was shaky from the delivery and it would have taken her between three to five minutes to reach a neighbor's house. The State was able to show that she sent several text messages using her cell phone until 7:57 p.m. on January 15, 2009, the day of the birth. Usnick also testified that the nearest emergency services were approximately 20 minutes from her location. There was, however, an ambulance substation located approximately 3/4 a mile away.

4

Usnick was charged by Information with second degree murder.[2] The State contended in the Information that Usnick recklessly caused the death of Baby Usnick "by giving birth to said child unattended and failing to secure assistance and medical attention for said child following birth and by enclosing said child in a plastic bag and container." The Information did not charge Usnick with drowning Baby Usnick.

At trial, the State presented the testimony of three physicians regarding Baby Usnick's death. Dr. Carl Stacy ("Dr. Stacy") performed the autopsy on Baby Usnick. Dr. Douglas Miller ("Dr. Miller") performed an analysis of Baby Usnick's brain as part of the autopsy. Dr. Christopher Long ("Dr. Long") conducted the toxicology portion of Baby Usnick's autopsy.

The State's theory as to the cause of death was "hypoxia." Hypoxia is a general term referring to a deficiency in oxygen. The specific cause of the hypoxia is uncertain. Dr. Stacy testified that based on the clotting of the placenta it is unlikely that there was a placental abruption that deprived Baby Usnick of oxygen prior to birth. Dr. Stacy also testified that Baby Usnick could have died from having the umbilical cord wrapped around her neck--a condition called nuchal cord--which occurs naturally. Baby Usnick was found by police with her umbilical cord wrapped around her neck. Dr. Stacy also found subgaleal hemorrhages inside Baby Usnick's scalp, which is an occurrence consistent with a vaginal

---

[2] The First Amended Information included charges for the class D felony of abandonment of a corpse, section 194.425; class C felony of possession of a controlled substance, section 195.202; class A felony of attempt to manufacture a controlled substance, section 195.211; and class A misdemeanor of endangering the welfare of a child, section 568.050. Usnick plead guilty to possession of a controlled substance and endangering the welfare of a child and the State dismissed the remaining two charges. All statutory references are to RSMo 2016 as updated through December 31, 2016, unless otherwise noted.

delivery and supports a finding that the baby's heart was beating during the time the baby passed through the uterine canal. Due to decomposition and other factors it was not possible to medically determine if Baby Usnick had drowned in the toilet. It was Dr. Stacy's opinion that the baby died during delivery or shortly after delivery. Dr. Stacy opined that had the baby been born in a hospital or in the presence of someone with medical training the baby could have been resuscitated.

Dr. Long conducted the toxicology portion of Baby Usnick's autopsy. Dr. Long testified that there was methamphetamine in Baby Usnick's internal organs which established that the baby was alive in utero when the methamphetamine was introduced because the baby's heart had to be beating for the drugs to transfer from the mother into the tissues of the baby.

Dr. Miller testified that he found nothing in his examination of Baby Usnick's brain which would have contributed to the cause of death. There were no hypoxic changes to her brain cells from which he concluded she was not deprived of oxygen or blood supply while she was alive for a long enough period of time to cause those types of changes to occur.

At the close of the State's evidence and at the close of all evidence Usnick moved for a judgment of acquittal based, in part, on the State's failure to demonstrate how Baby Usnick died.[3] The motions for judgment of acquittal were overruled and the case was submitted to the jury. The court instructed the jury on second degree murder and the lesser

---

[3] These issues were also properly raised in a Motion for New Trial (collectively, "Motions").

included offense of first degree involuntary manslaughter. The jury ultimately found Usnick guilty of involuntary manslaughter for which she was sentenced to five years' imprisonment.[4]

This appeal followed.

## Discussion

Usnick presents seven points of error on appeal. Usnick's first three points on appeal are dispositive. They collectively allege that the circuit court erred in overruling her Motions because there was insufficient evidence to submit the question of involuntary manslaughter to the jury as the State failed to establish that Baby Usnick died as a result of Usnick's reckless or criminal actions.

Review of an order denying a motion for new trial is for abuse of discretion. *State v. Aaron*, 985 S.W.2d 434, 436 (Mo. App. W.D. 1999). "We find such an abuse when the trial court's ruling clearly offends the logic of the circumstances or when it becomes arbitrary and unreasonable." *Id.* "A sufficiency of the evidence argument is reviewed to determine if a reasonable juror had enough evidence to find the defendant guilty beyond a reasonable doubt." *State v. Johnson*, 284 S.W.3d 561, 572 (Mo. banc 2009). "Evidence and inferences favorable to the state are accepted, and contrary evidence and inferences are disregarded." *Id.*

Here, our discussion is framed by the State's Information, which alleged that Baby Usnick died because Usnick gave birth to Baby Usnick unattended and failed to secure

---

[4] Usnick was also sentenced to a concurrent five years' imprisonment following a guilty plea to possession of a controlled substance and ninety days in jail following a guilty plea for endangering the welfare of a child, with credit for time served and to run concurrently with her other sentences.

7

assistance and medical attention for Baby Usnick following birth and enclosed Baby Usnick in a plastic bag and container. As to each alleged cause of Baby's Usnick's sad death, we must determine whether the cause of death alleged in the Information can support a finding of criminal culpability as a matter of law, and if it can, whether the State submitted sufficient evidence to permit the jury to find that the alleged act was the cause of Baby Usnick's death.

We first address the allegation in the Information that Baby Usnick died because Usnick gave birth to Baby Usnick unattended. Although Missouri has yet to squarely address the issue, it is firmly established in Missouri that "[a] person is not guilty of an offense *based solely upon an omission to perform an act* unless the law defining the offense expressly so provides, or a duty to perform the omitted act is otherwise imposed by law." *State v. Voss*, 488 S.W.3d 97, 110 (Mo. App. E.D. 2016) (discussing failure to take action in the context of a charge for involuntary manslaughter). Usnick correctly argues (and the State does not contest) that there is no duty imposed on expectant mothers to have a medically attended birth, at the risk of criminal prosecution. Many mothers voluntarily choose to give birth at home without medical assistance and others don't make that conscious choice but the unpredictability of child birth forces them to give birth wherever they may happen to be when the natural process results in birth before they can reach medical assistance. Massachusetts has accumulated cases from jurisdictions around the country that have considered such a question. *See Commonwealth v. Pugh*, 969 N.E.2d 672, 688 n.24 (Mass. 2012). Other courts have largely disfavored imposing such liability

8

for multiple reasons including that it violates a woman's constitutional rights to refuse medical treatment. *Id.* This finding is supported by this Court's holding in *State v. Wade*, 232 S.W.3d 663, 665 (Mo. App. W.D. 2007) which held that Section 1.205.4 "precludes any effort to prosecute a mother who causes indirect harm to her fetus by ingesting illegal drugs during her pregnancy . . . ." Section 1.205.4 specifically states that, despite a fetus being defined as a person under section 1.205, "[n]othing in this section shall be interpreted as creating a cause of action against a woman for indirectly harming her unborn child by failing to properly care for herself or by failing to follow any particular program of prenatal care." We therefore conclude as a matter of first impression that Usnick's medically unattended delivery of Baby Usnick cannot support criminal prosecution as a matter of law. It is thus unnecessary to address whether the State's evidence was sufficient to support a finding that Baby Usnick's medically unattended delivery was the cause of her death.

We turn next to the State's assertions that Baby Usnick died because Usnick failed to secure assistance and medical attention for Baby Usnick following birth, and because Usnick enclosed Baby Usnick in a plastic bag and container. "The State is required to prove the cause of death beyond reasonable doubt[.]" *State v. Closterman*, 687 S.W.2d 613, 617 (Mo. App. W.D. 1985). The State is also required to prove that the cause of Baby Usnick's death was a criminal act, the "*corpus delicti*."

> "The State has the burden of establishing the *corpus delicti*." *State v. Hayes,* 347 S.W.3d 676, 681 (Mo. App. E.D. 2011). "In a homicide case, the *corpus delicti* consists of two elements: (1) proof of the death of the victim, and (2) evidence that the criminal agency of another caused the victim's death." *Id.* "These elements may be proven by circumstantial evidence, but are not established until it has been proved that the death was not self-inflicted, due to natural causes, or an accident." *Id.* "The *corpus delicti* cannot be

9

presumed and must be proved by legal evidence sufficient to show that the crime charged has been committed by someone." *Id.* (quoting *State v. Edwards,* 116 S.W.3d 511, 544 (Mo. banc 2003)).

*State v. Byrd*, 389 S.W.3d 702, 710 (Mo. App. E.D. 2012). "[T]he state has the burden of convincing the jury beyond a reasonable doubt as to each element of the offense, including, in a homicide case, the fact that the victim died as a result of defendant's act." *State v. Corpier*, 793 S.W.2d 430, 441 (Mo. App. W.D. 1990). Applied here, it was insufficient for the State to prove simply that Baby Usnick died after Usnick gave birth. The State was required to prove that Baby Usnick's death was caused by a criminal act. "A person is not guilty of an offense unless his liability is based on conduct which includes a voluntary act." Section 562.011.1.

To prove that **Usnick** caused the death of Baby Usnick, it was therefore necessary for the State to prove that the cause of Baby Usnick's death was Usnick's failure to seek medical assistance after the delivery, or Usnick's placement of Baby Usnick into a plastic bag. Correspondingly, the State was obligated to prove that Baby Usnick did not die naturally. The State's evidence did not sustain this burden.

We begin by addressing Usnick's alleged failure to seek medical assistance after the delivery. At trial, the State contended that the cause of death was "hypoxia." The State concedes that the specific cause of the hypoxia is uncertain. Hypoxia can result from natural causes as well as criminal acts. Dr. Stacy testified that based on the clotting of the placenta it is unlikely that there was a placental abruption that deprived Baby Usnick of oxygen in utero. Baby Usnick was found by police with her umbilical cord wrapped around her neck, thus Dr. Stacy testified regarding his opinion as to whether Baby Usnick's death

10

could have been caused by nuchal cord, a natural cause of death. At trial Dr. Stacy testified that the cord "wasn't tightly constricted around the neck. It could have -- in my opinion, it could have been removed as the baby was delivering if there was somebody that had the education to do that present." He also testified that he did not believe that the wrapping of the umbilical cord was sufficient to compromise the airway. There was an indentation in Baby Usnick's neck from the cord, but Dr. Stacy opined that the groove would have been deeper had the umbilical cord cut off Baby Usnick's airway.

On cross-examination, Dr. Stacy admitted that during the preliminary hearing he testified that nuchal cord was "the most likely cause of death." He further acknowledged that he still believed that death due to nuchal cord was a "possibility." Dr. Stacy's only explanation for the shift in his opinion was that, had he known that Baby Usnick been born in a toilet at the time of his autopsy, he "would have been more circumspect."

Dr. Stacy otherwise testified that there were no external or internal injuries on Baby Usnick. Nor were there any congenital abnormalities that would have accounted for her death. Dr. Stacy testified that he would be unable to tell if Baby Usnick had drowned in the toilet because there would "probably" be no evidence to find. Ultimately, Dr. Stacy testified with "a reasonable degree of medical certainty" that Baby Usnick was born "viable." By "viable," however, Dr. Stacy stated that he meant that "if [Baby Usnick] *had been born in a hospital* or at least with somebody with some [medical] knowledge around, they could have resuscitated this infant. That's what I mean by viable." Further stating that: "In my opinion, *if this delivery had occurred in a hospital with some expertise* there,

11

that resuscitation could have occurred." Dr. Stacy thus opined that it is likely Baby Usnick required medical resuscitation due to hypoxia at the time of her delivery.

Dr. Stacy did not, however, provide an opinion within a reasonable degree of medical certainty as to the cause of the hypoxia that required Baby Usnick's resuscitation. He thus offered no opinion permitting a reasonable inference that the cause of the hypoxia was a criminal act, and was not instead a natural peril of child birth. On cross-examination Dr. Stacy admitted that "No, I don't have a cause of death." Instead, Dr. Stacy's testimony left open the possibility that Baby Usnick's oxygen deprivation was due to natural causes, only opining so far as to say that if Baby Usnick had been born in a hospital or *had the delivery been attended by a medical professional*, she could have been resuscitated. Additionally, Dr. Stacy testified that the timing of Baby Usnick's death was "most likely during delivery, but it could have been shortly after delivery." He could not be certain as to which it was but he believed there was more air or gasses in the lungs than one would expect solely from decomposition.

Dr. Miller performed an analysis of Baby Usnick's brain as part of her autopsy. Dr. Miller testified that he could neither tell the cause of death nor the timing of death based on his examination.

Dr. Long testified that Baby Usnick had methamphetamine present in both her blood and her liver tissue. The presence of the methamphetamine demonstrated that Baby Usnick was alive in utero. Dr. Long testified that the concentration of methamphetamine in her system was a "potentially lethal" amount. Dr. Long further testified that medical attention *at the time of birth* would have been required to help the baby continue to live.

12

The testimony of these three doctors was the entirety of the evidence submitted by the State to establish the cause of Baby Usnick's hypoxia. Even when read in the light most favorable to the verdict, the testimony of the expert witnesses was that the cause of the hypoxia (the theory of death tendered by the State) was unknown and merely that had the birth ***been attended by a medical professional***, Baby Usnick may have survived. We have already explained why Baby Usnick's unattended birth cannot support criminal culpability. None of the expert witnesses testified that but for Usnick's failure to seek medical assistance after Baby Usnick's birth, Baby Usnick would not have died.

The State contends that the specific cause of death need not be proven. In support, the State argues that this case is similar to that of *State v. West*, 551 S.W.3d 506 (Mo. App. E.D. 2018). In *West* a child died while under the care of the defendant. *Id.* at 518. The exact cause of the Child's injuries were unknown because the defendant was the "only adult present in the home." *Id.* The defendant denied that she caused the child's injuries, giving various versions of events regarding how the child accidently fell down a flight of stairs, causing him to become unresponsive. *Id.* The State presented testimony that the child had no injuries prior to being left in the care of the defendant. *Id.* There was expert medical testimony from a treating physician that she had never seen a fall down the stairs result in the type of injuries the child had and felt that "the only reasonable explanation for Victim's injury was abusive head trauma." *Id.* at 513. Additionally, the chief medical examiner testified that the autopsy results were "highly correlated with abusive head injury as opposed to accidental head injury." *Id.* The Court ultimately found that there was

13

sufficient evidence to find that the defendant had recklessly caused the death of the Victim. *Id.* at 519.

*West* is readily distinguishable from the facts of this case. In *West* the State presented expert medical testimony demonstrating that, although the specific cause of the victim's injuries was unknown--what Usnick refers to as the "specific mechanism of death"--the cause was not consistent with the defendant's explanation of an accidental fall and instead consistent with abusive head trauma. The experts testified that the cause of death was caused by some abusive act by the defendant, not by an accident. In this case, the State's experts presented no such testimony. While *West* supports an argument that the expert does not need to testify as to the exact means by which the criminal death was caused, they must be able to testify that, in their expert medical opinion, the cause of death was a criminal act.

In this case, the State put forth that Baby Usnick died of hypoxia but the specific cause of that hypoxia was unknown and the State's experts allowed that it could have been caused by the natural perils of child birth. The State, however, points to several different potential criminal causes of death of which there is some evidence and argues that, under the circumstances, the jury should be able to determine the criminal nature of the death without the determination being supported by expert testimony. The general rule is that "[t]he cause of death may be established in a prosecution for unlawful homicide without the use of expert medical testimony where the facts in evidence are such that every person of average intelligence would know from his [or her] own experience or knowledge that the wound was mortal in character." *State v. Lusk*, 452 S.W.2d 219, 223 (Mo. 1970).

14

However, where an "average lay juror could not form a well grounded opinion of causation" from the facts as presented, there is a lack of proper foundation to submit the case to the jury. *See Id.* An average juror is not familiar with the possible causes of death surrounding child birth or of the causes of hypoxia during child birth. Where even the experts were unable to determine within a reasonable degree of medical certainty a clear cause of death we cannot say that a lay juror would be able to make a determination that this death was caused by a criminal act as opposed to natural causes. Thus, expert testimony was needed to establish a cause of death. Without testimony from an expert that Baby Usnick's death was caused by a criminal act, there was insufficient evidence of *corpus delicti* and the case should not have been submitted to the jury.

It is true that Usnick testified that she had no minutes on her cell phone so could not call for help and, even if she had, she claimed the closest medical support was twenty minutes away, and that the State countered this testimony showing that she was sending and receiving text messages the day of the birth and that there was an ambulance substation located approximately 3/4 of a mile away. It was thus contested whether Usnick could have summoned medical assistance after Baby Usnick's delivery, permitting the jury to reasonably infer that she could have. However, that inference is meaningless without evidence that medical assistance secured after the delivery would have mattered. The State, presented no evidence about how quickly medical assistance could have arrived *after* the birth or that even if immediately summoned that medical assistance would have saved Baby Usnick. Dr. Stacy only testified that Baby Usnick could have been resuscitated had a person with medical training been *present* during delivery, not after delivery. Dr. Long

15

also testified that medical attention *at the time of birth* would have been required to help the Baby Usnick continue to live. There was no medical testimony as to how long Baby Usnick would have been able to survive without medical assistance. Nor was there testimony as to how long it would have likely taken for medical assistance to arrive. At best, Dr. Stacy testified that Baby Usnick died during delivery or shortly after delivery.[5] Because there was no evidence to support a finding that immediately summoning medical assistance after the birth would have prevented Baby Usnick's death, there was insufficient evidence to submit this to the jury as a cause of Baby Usnick's death.

That leaves the final cause of death charged in the Information--that Usnick caused Baby Usnick's death by placing her in a plastic bag or container. There was no evidence that being enclosed in a plastic bag and container caused Baby Usnick's death. The only evidence was that Baby Usnick was placed in the bag and container a significant period of time after her birth, after Usnick had recovered from the delivery, gone to her room to dress, and then returned to the bathroom. The State's own evidence was contrary to this as a cause of death. All of the evidence supported a finding that Baby Usnick was dead before she was placed in the bag and container. The only two criminal causes of death charged in the Information--or ultimately instructed to the jury--had no evidentiary support.

On appeal, the State argues in its brief that there was evidence to suggest that Baby Usnick died as a result of drowning because Usnick left her in toilet water after her birth.

---

[5] We note that "[c]ourts in other states have confronted similar evidentiary shortfalls regarding causation and reached similar conclusions." *Patel v. State*, 60 N.E.3d 1041, 1054 (Ind. App. 2016) (collecting cases; reversing felony child-neglect conviction based on insufficiency of evidence to establish that defendant's failure to summon medical assistance for newborn baby caused the baby's death).

This, however, as with any other uncharged method of death cannot form the basis for submitting the case to the jury. Further, there was no evidence that Baby Usnick was alive at the time she entered the water. There was no evidence that Baby Usnick cried, moved or gave any indication of life following the delivery. Dr. Stacy specifically testified that due to decomposition there would be no medical evidence to support a finding of drowning.

> Under Missouri law, "when a crime may be committed by any of several methods, the information (or indictment) must charge one or more of the methods, and the method or methods submitted in the verdict directing instruction must be among those alleged in the information, and when submitted in the disjunctive each must be supported by evidence." *State v. Lusk*, 452 S.W.2d 219, 223 (Mo. 1970). The indictment charging Richter clearly identifies both striking and shaking L.S. as causing his injuries, and the State presented expert medical testimony from multiple witnesses that L.S.'s injuries were caused by striking or shaking and not from a fall as described. Thus, the general requirements of *Lusk* were met. We now must determine whether instructing in the disjunctive was proper, given the requirement that there be jury unanimity. *State v. Marks*, 721 S.W.2d 51, 54 (Mo. App. W.D. 1986).

*State v. Richter,* 504 S.W.3d 205, 211 (Mo. App. W.D. 2016)." "A disjunctive submission of alternative means by which a single crime is committed is proper if both alternatives are supported by sufficient evidence and the alternative means are in the same 'conceptual grouping.'" *Id.* (quoting *Richardson v. U.S.*, 526 U.S. 813, 819 (1999)) (emphasis added). "It has long been the rule that when a crime may be committed by any of several methods, the information must charge one or more of the methods, and the method or methods submitted in the verdict directing instruction must be among those alleged in the information, and when submitted in the disjunctive each must be supported by evidence." *State v. Shepard,* 442 S.W.2d 58, 60 (Mo. banc 1969). Although the methods of the crime were charged in this case in the conjunctive, the same general principles must necessarily

17

be true. The causes of death submitted to the jury must have been included in the indictment and each must be supported by evidence. The only criminal cause of death of which there may have been some evidence, drowning, was not charged in the Information and thus could not form the bases for the submission of that cause to the jury.

Given that we find that the State failed to present sufficient evidence from which a jury could determine that Usnick either purposefully or recklessly caused the death of Baby Usnick the trial court erred in overruling Usnick motion for acquittal at the close of State's evidence and we need not address Usnick's other points on appeal.

## Conclusion

For the reasons stated above, we find that the circuit court erred in denying Usnick's Motions because there was insufficient evidence to submit the case to the jury. We accordingly reverse Usnick's conviction of first degree involuntary manslaughter.

_____
Gary D. Witt, Judge

All concur

18